*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 28, 2022

Plaintiff-Appellee,

v

No. 354367
Muskegon Circuit Court
LC No. 19-001205-FC

JOHN FITZGERALD-CLULP SMITH, also known
as JOHN FITZGERALD SMITH and JOHN
FITZGERALD-CULP SMITH,

Defendant-Appellant.

Before: CAMERON, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

Defendant appeals by right his jury conviction of armed robbery, MCL 750.529. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve 46 to 80 years in prison. On appeal, defendant challenges the traffic stop that led to his arrest and argues that his trial was unfair. Specifically, he maintains that the trial court erred when it allowed the prosecution to present his booking information to the jury and erred when it allowed evidence that he committed other robberies. He also complains that the prosecutor deprived him of a fair trial by vouching for witnesses and denigrating the defense. Finally, defendant argues that the trial court improperly scored the sentencing guidelines. He contends that he is entitled to a new trial, or at the least, to be resentenced on the basis of these errors. For the reasons explained, we affirm defendant's conviction and sentence.

## I. BASIC FACTS

Testimony and evidence established that a black man with a mustache entered the Dollar General on East Laketon in Muskegon, Michigan, just after the store opened on October 28, 2018. The man pulled a gun on the store's manager, Latora Howland, who was working alone at the time, and forced her to open the store's safe. The man stole a bank bag, loose cash, and coin rolls.

Howland testified that the same man robbed her again shortly after the store opened on January 13, 2019. The man robbed her and another employee using a knife. After the man stole

-1-

the money she had been counting in the office, he demanded the rest of the money and pushed her toward the safe. She opened the safe for him, but it did not have a bank bag inside it on that day.

Another employee of Dollar General, Lateashia Evans, testified about a similar robbery that occurred on January 27, 2019, at the Dollar General on Henry Street in Muskegon, Michigan. She stated that a man robbed her at knife point. After forcing her to open the store's safe, the man asked her where the bag was. She told him that she could not open that safe.

Officers who responded to the third robbery discovered evidence tending to show which way the suspect fled. That evidence led them to video evidence depicting the SUV that the suspect used to get to and from the Dollar General. An officer recognized the make and model of the SUV and put out a call to be on the lookout—a BOLO—for that SUV. Another officer pulled over defendant after the officer saw defendant driving an SUV that matched the description stated in the BOLO.

Howland later identified defendant as the man who robbed her in October 2018 and January 2019, after an in-person lineup.

The trial at issue in this appeal involved only whether defendant committed the robbery in October 2018. Nevertheless, the trial court allowed the prosecution to present evidence concerning the other two robberies over defense objection.

After the close of proofs, defense counsel argued to the jury that Howland's identification could not be trusted and asked the jury to find defendant not guilty. The jury found defendant guilty as charged. This appeal followed.

II. SUPPRESSION OF EVIDENCE

A. STANDARD OF REVIEW

Defendant first argues that the trial court should have suppressed all the evidence obtained after his traffic stop and arrest on the ground that the stop and arrest amounted to an unreasonable search and seizure contrary to the Fourth Amendment. Defendant concedes that his claim of error is unpreserved because defense counsel did not move to suppress the evidence in the trial court, but he nevertheless argues that it amounted to plain error. He also argues that defense counsel provided ineffective assistance by failing to move to suppress the evidence.

This Court reviews de novo the proper application of constitutional law to the facts of the case. *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019). However, because defendant did not preserve this claim of error for appellate review, this Court must review his claim for plain error affecting his substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish plain error that warrants relief, defendant must show that the trial court made a plain or obvious error and that the error prejudiced his trial. See *id*. Whether defense counsel was ineffective involves a mixed question of fact and law. *People v Gioglio (On Remand)*, 296 Mich App 12, 19; 815 NW2d 589, remanded for resentencing 493 Mich 864 (2012). This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20.

## B. ANALYSIS

The constitutions of the United States and Michigan both protect persons from unreasonable searches and seizures. *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000), citing US Const, Am IV and Const 1963, art 1, § 11. Police officers must have a warrant to search or seize someone or something unless an exception to the warrant requirement applies. *Kazmierczak*, 461 Mich at 418. One such exception to the warrant requirement involves a brief traffic stop to investigate possible criminal activity—a so-called *Terry* stop. *People v Barbarich*, 291 Mich App 468, 473; 807 NW2d 56 (2011), citing *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). "Under this doctrine, if a police officer has a reasonable, articulable suspicion to believe a person has committed or is committing a crime given the totality of the circumstances, the officer may briefly stop that person for further investigation." *Barbarich*, 291 Mich App at 473.

As our Supreme Court has explained, an officer does not need to have probable cause to arrest someone in order to make an investigatory stop, but the officer must have more than a mere hunch that the person has committed a crime:

> Whether an officer has reasonable and articulable suspicion to briefly detain an individual is a fact-specific inquiry that is determined on a case-by-case basis. A determination regarding whether a reasonable suspicion exists must be based on commonsense judgments and inferences about human behavior. Although reasonable and articulable suspicion is a lesser showing than probable cause, it still entails something more than an inchoate or unparticularized suspicion or hunch, because an officer must have had a particularized and objective basis for the suspicion of criminal activity. [*People v Pagano*, 507 Mich 26, 32; 967 NW2d 590 (2021) (quotation marks and citations omitted).]

On appeal, defendant argues that Sergeant Casey Bringedahl's review of the video evidence showing the SUV was insufficient to issue a BOLO for a black Toyota Sequoia with aftermarket rims. Sergeant Bringedahl, however, did not pull over defendant during the traffic stop; Officer Brandon DeKuiper pulled over defendant. Officer DeKuiper had the right to rely on information, which was conveyed to him by other officers over the radio or through the Law Enforcement Information Network; he had no obligation to second-guess the information or investigate whether the information provided to him was accurate. See *People v Freeman*, 240 Mich App 235, 236-237; 612 NW2d 824 (2000); *People v Bell*, 74 Mich App 270, 277; 253 NW2d 726 (1977); see also MCL 764.15(1)(c) and (f). In any event, contrary to defendant's contention on appeal, Sergeant Bringedahl's assessment of the evidence did not amount to a mere hunch—it involved good police work that supported issuing the BOLO, which justified stopping a vehicle that matched that description for further investigation.

Sergeant Bringedahl began to assist with the investigation after the second robbery at a Muskegon Dollar General. He responded to the third robbery and saw evidence that suggested the person who robbed the store discarded a phone in the parking lot. There was also evidence that several one-dollar bills were strewn through the parking lot and that a set of footprints led through the snowy parking lot to an area by the Catholic Center across from the Dollar General. A neighbor also spoke to Sergeant Bringedahl and stated that he saw a black SUV drive north along an alley,

which he thought was suspicious. Sergeant Bringedahl observed that there were cameras on the Catholic Center. Because the evidence suggested that the suspect fled in that direction, Sergeant Bringedahl contacted the Catholic Center in the hope that he might view the video from the cameras. He viewed the video and believed that the images did in fact capture images of the person who robbed the Dollar General.

Sergeant Bringedahl stated that the video showed a black SUV driving down one alley and then backing into the alley by the Catholic Center. He stated that the Catholic Center's videos were timestamped 41 minutes faster than real time. The cameras recorded a person walking from the SUV toward the Dollar General. The same person came back minutes later and got into the SUV and drove away to the north. The timing of the recording corresponded with the known times of the robbery and strongly suggested that the videos depicted the person who actually robbed the Dollar General and showed that he used the black SUV to get to and flee from the scene.

Sergeant Bringedahl also testified that he recognized that the black SUV was a Toyota Sequoia. He recognized the make and model because he was a "vehicle geek," an amateur mechanic, and had worked on cars. A friend's father also owned a Toyota Sequoia when he was in high school. Sergeant Bringedahl noticed that the Toyota Sequoia had black aftermarket rims on it, and he also knew that Toyota only made that particular body style from about 2000 to 2007. Accordingly, he issued a BOLO for a black Toyota Sequoia manufactured from 2000 to 2007, which had black aftermarket rims, because that vehicle may have been involved in the robbery. The video images from the Catholic Center depict an SUV that is consistent with a Toyota Sequoia. Sergeant Bringedahl's assessment of the evidence was reasonable and established that the vehicle depicted in the images was involved in the robbery and that it was likely a Toyota Sequoia with black aftermarket rims. Accordingly, there was nothing improper about his BOLO and Officer DeKuiper could reasonably rely on that BOLO.

Defendant argues that the generic information that Sergeant Bringedahl provided was inadequate to justify a stop. He maintains that a stop would only be justified if Sergeant Bringedahl provided information that uniquely identified the vehicle that might have been involved—such as a broken taillight, a bumper sticker, a license plate number. He also suggests that the information was too stale because several hours had passed since the robbery. Defendant's arguments are unavailing. The information did not need to be so unique; it only needed to be sufficiently detailed to cause an officer using commonsense to have a reasonable and articulable suspicion that the person driving the SUV might have been involved in the crime. See *Pagano*, 507 Mich at 32. The information about the SUV was sufficiently detailed to justify Officer DeKuiper's decision to pull over defendant. The BOLO identified the make and model of the SUV—a Toyota Sequoia—and its color. Although those facts might not be sufficient standing alone to justify a stop to further investigate, the BOLO also noted that the SUV was older—a late 1990s or early 2000s model year—and had aftermarket rims that were black. These added details sufficiently narrowed the class of vehicles that fit the description to justify a traffic stop of a driver who was driving such a SUV to further investigate whether the driver was the person suspected of being involved in the robbery. See *Barbarich*, 291 Mich App at 473.

The timing of the stop was also not so far removed from the time of the robbery that it would cause a reasonable person to no longer have a reasonable and articulable suspicion that the driver of the SUV might have been involved. A sighting within minutes of a robbery and within

-4-

a short distance would more emphatically support such a suspicion, but the timing also did not exclude the possibility that the suspected robber was still within the area. See *People v Oliver*, 464 Mich 184, 200; 627 NW2d 297 (2001) (identifying time and distance from the event and scene of the crime as factors to consider in determining whether a stop was reasonable). The evidence showed that the police officers were searching for a person who robbed a Dollar General in Muskegon, and the robbery was the third such robbery in the community. There was, therefore, reason to believe that the suspect lived within the region. Under those circumstances, the fact that the robbery had occurred just hours earlier added weight to the suspicion that the driver of a SUV might have been involved and should be stopped for further investigation. Officer DeKuiper had a reasonable, articulable suspicion that the driver of the SUV might have been involved in the robbery and so had justification to make a brief investigatory stop. Consequently, because an exception to the warrant requirement applied, the stop was not unreasonable within the meaning of the protection against unreasonable searches and seizures. See *Barbarich*, 291 Mich App at 473.

Although it is unclear whether Officer DeKuiper arrested defendant at the scene of the stop, Officer DeKuiper had the authority to arrest defendant if—after conducting his brief investigation—he had probable cause to believe that defendant committed the armed robbery that occurred earlier that day. See *People v Kelly*, 231 Mich App 627, 631; 588 NW2d 480 (1998). Officer DeKuiper did not have to be certain that defendant committed the robbery to arrest him; he only needed to have sufficient information to believe that there was a probability or substantial chance that defendant was involved in the robbery. See *People v Lyon*, 227 Mich App 599, 611; 577 NW2d 124 (1998). If there was evidence that would "justify a fair-minded person of average intelligence in believing that the suspected individual had committed the felony," then Officer DeKuiper could proceed to arrest defendant without first obtaining an arrest warrant. *Kelly*, 231 Mich App at 631.

Once Officer DeKuiper pulled over defendant, Officer DeKuiper discovered that defendant matched the description of the person who robbed the Dollar General. Defendant was African-American, had a mustache, and wore clothing that fit the description of clothing worn by the person suspected of committing the robbery. These similarities to the person suspected of committing the robbery just hours earlier, when viewed in context, warranted defendant's arrest without a warrant. Defendant not only matched the description of the perpetrator, he was also pulled over while driving an SUV that matched the SUV identified as the SUV driven away from the scene of the robbery. Considered together, that evidence would justify a fair-minded person's belief that the person driving the SUV was in fact the person who committed the robbery. See *id*.

Officer DeKuiper lawfully stopped defendant for further investigation and, after the stop, Officer DeKuiper or some other officer lawfully arrested defendant once it was verified that defendant matched the description of the suspected robber and was driving a SUV that matched the description of the SUV seen fleeing the scene of the robbery. Defendant has not shown that the trial court plainly erred when it failed to sua sponte suppress the evidence that was discovered after defendant's stop and arrest. See *Carines*, 460 Mich at 763. Furthermore, because the stop and arrest were lawful, defense counsel cannot be faulted for failing to move to suppress any evidence as the fruit of an unlawful stop and arrest. Defense counsel had no obligation to make a meritless motion to suppress the evidence. See *Clark*, 330 Mich App at 426.

## III. DATA SHEET AND PHOTOS

### A. STANDARD OF REVIEW

Defendant next argues that the trial court plainly erred when it allowed the prosecution to admit a data sheet with prejudicial information and his booking photo. He similarly argues that the court should not have allowed the prosecutor to present other exhibits that had his booking photo. He asserts that defense counsel provided ineffective assistance for failing to object to these exhibits.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *Clark*, 330 Mich App at 415 (citation omitted). "A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes." *Id*. This Court reviews de novo whether the trial court properly interpreted and applied the rules of evidence. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). A trial court necessarily abuses its discretion when it premises its decision on an error of law. *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017). However, because these claims of error are unpreserved, defendant must demonstrate that the trial court plainly erred when it allowed the admission of these exhibits and that the plain error affected his substantial rights. See *Carines*, 460 Mich at 763.[1] As for the claim of ineffective assistance, this Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Gioglio*, 296 Mich App at 19-20.

### B. ANALYSIS

The trial court allowed the admission of three exhibits—Exhibits 70, 71, and 131—that the prosecution presented and which defendant now claims amounted to plain error. These exhibits each depicted an image or images of defendant, and Exhibit 70 included some information about defendant related to his booking and also similar information about the other persons selected for the corporeal lineup.

To be admissible, the proponent of the evidence had to establish that the documents and images were relevant. See MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even if relevant, evidence may be excluded if the "probative value" of the evidence is "substantially outweighed by the danger of unfair prejudice." MRE 403.

Sergeant Todd Gilchrist testified that he created the documents that composed Exhibit 70 as part of his effort to create a fair corporeal lineup for Howland. He stated that he needed to assemble a six-person lineup that included defendant. He looked for persons at the jail who had

---

[1] As the prosecutor correctly notes on appeal, defense counsel may have waived any claim of error regarding the admission of Exhibit 70 by stating that she had no objections to its admission. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Nevertheless, for the sake of completeness, we have addressed whether it was plain error to admit it.

similar height, weight, description, skin tone, and facial hair. He indicated that he wanted the people to be similar, but not so similar that they looked like a twin. He stated that Howland did not know that defendant was the suspect at the time of her identification. She did not see the documents that he prepared for the lineup and did not see his notes on them.

Sergeant Gilchrist testified that Exhibit 71, which was admitted without objection, was the image taken when defendant was booked into the jail; it was initially used to find persons of comparable appearance. Sergeant Gilchrist testified that he not only reviewed the documents before compiling the lineup, but he also conducted a "physical observation" of the other persons selected so that he could be "sure they meet the criteria that we are looking for for that." Sergeant Gilchrist stated that none of the persons who examined the proposed lineup before it was shown to Howland, which included a defense attorney, objected to the persons who composed the lineup.

The prosecutor also prepared some demonstrative exhibits from the exhibits already admitted, which the trial court admitted as Exhibit 131. Exhibit 131 contained still images of the robber taken from the videos of the robberies, which were set next to an image of defendant's driver's license photo and the booking photos.

In this case, the defense did not challenge whether there was a robbery at the Dollar General. Instead, the defense challenged whether the prosecution had been able to establish beyond a reasonable doubt that defendant was the robber. See *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008) (stating that identity is an element of every offense). Because Howland was the only person who positively identified defendant as the man who robbed her, defendant's lawyer spent a significant amount of time attacking her credibility. The prosecution could, for that reason, present evidence that tended to bolster the credibility of Howland's identification; such evidence is always relevant. See *People v McGhee*, 268 Mich App 600, 637; 709 NW2d 595 (2005); *People v Johnigan*, 265 Mich App 463, 465-466; 696 NW2d 724 (2005).

Howland identified defendant as the perpetrator of both the robberies for which she was present. However, she admitted that she had identified someone else in a photo lineup. To counteract the evidence that she had made a different identification at an earlier point, the prosecution presented evidence that she informed the officer that conducted the photo lineup that she was unsure of her identification. The prosecution contrasted that with evidence that Howland quickly identified defendant as the perpetrator during the corporeal lineup. Accordingly, whether the corporeal lineup was fair and included persons with similar appearances was a key factor in establishing the credibility of Howland's identification of defendant at that lineup, which in turn was an important component for the jury's ability to assess whether Howland was mistaken in her identification at trial. Consequently, evidence tending to show the physical characteristics and appearance of defendant and the other participants in the corporeal lineup was relevant and admissible. See MRE 401; MRE 402.

On appeal, defendant argues that this Court has recognized that mugshots are generally inadmissible. This Court has held that mugshots are inadmissible because, in most cases, the photo itself impermissibly places the defendant's criminal record before the jury. *People v Embry*, 68 Mich App 667, 670; 243 NW2d 711 (1976). In this case, however, neither the photos nor the data sheet with the photos put defendant's criminal record before the jury. The jury heard that defendant's photo, which appeared in Exhibits 70 and 71, was his booking photo, which did not

imply that he had a prior criminal record. The jury was also well aware that defendant was not before them by choice or happenstance—it knew that he had been arrested for the crime at issue and so would have been booked into jail. See *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010) (noting that jurors are well aware that the defendant has been arrested and does not appear before them by choice). Notably, by contrast with the data sheets for all the other participants in the corporeal lineup, defendant's data sheet indicated that he had no prior bookings, which suggested that he had no criminal record. There was nothing about the booking photo depicted in all three exhibits or the data accompanying the photo in Exhibit 70 that put defendant's criminal record before the jury, and nothing about the image branded him with the marks of guilt or otherwise created a risk that impermissible factors might come into play. See *id*. at 517-518.

The booking photo was relevant and admissible to establish defendant's appearance at the time of the corporeal lineup for comparison with the other persons selected for the lineup. It was also relevant and admissible to allow the jury to compare a known photo of defendant to the images taken from the videos of the robbery. See MRE 401; MRE 402. There was also nothing about the booking photo that suggested unfair prejudice. As such, the booking photo was not excludable under MRE 403. Consequently, the trial court did not plainly err when it admitted Exhibits 70 and 131, see *Carines*, 460 Mich at 763, and defense counsel cannot be faulted for failing to make a meritless objection to the admission of Exhibits 71 and 131 on that basis, see *Clark*, 330 Mich App at 426.

In Exhibit 70, there were some entries on the data sheet associated with defendant's booking photo that contained information that was not relevant and could have been redacted. For example, the data sheet indicated that defendant was classified as "MAX2" for security purposes and that he was divorced, had one dependent, and was unemployed. This information was not, however, particularly prejudicial. Many people are divorced, have dependents, and are unemployed. Although a juror might make an inference that defendant would not have been assigned to MAX2 if he were not dangerous, a reasonable juror might also infer that all persons arrested for robbery are placed in MAX2. As such, the inclusion of that irrelevant information on the data sheet did not necessarily give rise to a prejudicial inference. Had defense counsel objected, the trial court could easily have redacted the irrelevant information.

On this record, the trial court did not plainly err when it allowed the unredacted data sheet on defendant to be admitted as part of Exhibit 70. Additionally, any prejudice occasioned by including the unredacted data sheet was so minimal that it could not have affected the outcome of the trial. Therefore, defendant has not shown that the admission of Exhibit 70 amounted to plain, outcome-determinative error. See *Carines*, 460 Mich at 763. For similar reasons, defendant has not shown that defense counsel's failure to request the redactions amounted to ineffective assistance. There was no possibility that, but for defense counsel's failure to obtain redactions of the irrelevant information on the data sheet, the outcome would have been different. See *Gioglio*, 296 Mich App at 19-20.

Defendant's claim that defense counsel also provided ineffective assistance by eliciting damaging testimony that his SUV had been associated with previous criminal activity also lacks merit. After Sergeant Bringedahl testified on direct examination that he recognized the SUV depicted in the videos to be a black Toyota Sequoia and issued a BOLO for such a vehicle, defense counsel asked Sergeant Bringedahl about his decision to issue the BOLO. Defense counsel asked

questions that led Sergeant Bringedahl to discuss a police database that tracks vehicles involved in incidents—whether accidents or criminal matters. Sergeant Bringedahl stated that he did a search for black Toyota Sequoias in that database and discovered that three black Toyota Sequoias were in the database. The SUV that defendant was driving came up as one of the three and the record showed that a man named "John" was suspected of dealing narcotics from that vehicle.

In her closing, defense counsel argued that Sergeant Bringedahl used the information from the database to prejudge the case and direct the investigation to defendant even though there was no evidence to connect defendant to the robbery in October 2018. She associated that argument with the evidence that an eyewitness stated the SUV that drove off was actually a Lincoln Navigator, not a Toyota Sequoia.

From this, it appears that defense counsel elicited this testimony as part of a legitimate trial strategy to explain how police officers came to focus their investigation on defendant, even though he was—in her view—not involved. This Court cannot conclude that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms when the record shows that the act or omission might have been part of a reasonable trial strategy. See *Clark*, 330 Mich App at 427.

Defendant has not established any errors involving Exhibits 70, 71, and 131 that warrant appellate relief.

## IV. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

Defendant next argues that the trial court abused its discretion when it allowed the prosecution to present evidence of the other robberies over the defense's objection. This Court reviews a trial court's decision whether to admit evidence for an abuse of discretion. *Clark*, 330 Mich App at 415. "A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes." *Id*. This Court reviews de novo whether the trial court properly applied the rules of evidence. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). A trial court necessarily abuses its discretion when it admits evidence that was inadmissible as a matter of law. *Id*.

### B. ANALYSIS

Although character evidence might be relevant to a fact at issue, the rules of evidence place strict limits on the use of character evidence at trial. *People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009). This is because there is a danger that the jury will overestimate the probative value of the character evidence. *Id*. Accordingly, the rules of evidence generally preclude the admission of character evidence to prove "action in conformity therewith." MRE 404(a). Similarly, a party may not admit evidence concerning "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1). Instead, in order to be admissible under MRE 404(b), evidence of other acts must be admitted for a purpose other than to prove action in conformity with character. See MRE 404(b)(1) (listing proper purposes for which other-acts evidence may be admitted).

On appeal, the prosecution argues that the evidence from the other robberies was intrinsic evidence of the robbery in October 2018 and did not implicate MRE 404(b). In determining whether MRE 404(b) applies to evidence, our Supreme Court has rejected the contention that there is a so-called "res gestae" exception to the prohibition stated under MRE 404(b). *People v Jackson*, 498 Mich 246, 268; 869 NW2d 253 (2015). The Court explained that a test that depended on ascertaining whether the evidence of the other acts was so inextricably intertwined with the acts at issue or were otherwise necessary to complete the picture was one that threatened to erode the scope and protections afforded by MRE 404(b). *Id*. at 266-268. The Court went on to state that MRE 404(b) applies to all evidence of crimes, wrongs, or acts other than the conduct involved in the crimes at issue, which might give rise to a character-to-conduct inference. *Id*. at 269. Therefore, the relevant inquiry is whether the evidence from the robberies in January 2019 involved the conduct at issue for the charged crime or involved evidence of other crimes, wrongs, or acts that might give rise to a character-to-conduct inference.

The evidence from the other robberies clearly did not involve the conduct at issue for the robbery that occurred in October 2018, and it involved conduct that could give rise to an improper character-to-conduct inference. As such, MRE 404(b) applied. See *id*.

In order for evidence of other crimes, wrongs, or acts to be admissible consistent with MRE 404(b), the prosecutor must offer the evidence for a purpose other than to prove a character-to-conduct or propensity theory. *Yost*, 278 Mich App at 402. The prosecutor must next establish that the evidence is relevant and admissible to prove a fact of consequence at trial. Finally, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice under MRE 403. *Id*. at 402-403.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. MRE 404(b)(1) lists several purposes other than an improper character-to-conduct theory for which other-acts evidence might properly be admitted: other acts evidence may be admissible to prove "motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1). However, the list of proper purposes for the admission of other-acts evidence is not exhaustive. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). Indeed, the prosecutor may admit evidence of other crimes, wrongs, or acts for *any* purpose "other than the establishment of a defendant's character and his propensity to commit the offense." *Johnigan*, 265 Mich App at 465.

In the trial court, the prosecution asserted that it intended to present testimony and other evidence concerning the two robberies that occurred in January 2019, in relevant part, to establish defendant's identity as the person who committed the robbery in October 2018, and to show that defendant had a common scheme, plan, or system for committing the crimes. The trial court agreed that the evidence was relevant to prove identity and common scheme, plan, or system and so allowed the testimony and other evidence.

MRE 404(b) only bars the admission of other-acts evidence to prove that the defendant has bad character and that he or she acted in conformity with his or her bad character on the occasion at issue. MRE 404(b); see also *People v VanderVliet*, 444 Mich 52, 64-65; 508 NW2d 114 (1993),

-10-

amended 445 Mich 1205 (1994) (stating that MRE 404(b) only limits the use of evidence for an improper character-to-conduct theory; it does not preclude the use of evidence for any other purpose, even a purpose not listed under MRE 404(b)(1)).  For that reason, the prosecution had the right to present evidence about the other robberies if that evidence was relevant for a purpose other than to prove action in conformity with bad character.  In this case, the evidence of the other robberies was highly relevant to establishing defendant's identity as the perpetrator of the armed robbery at issue.

The testimony and evidence about the third robbery—the robbery at the store on Henry Street—established how it came to be that the police officers discovered defendant, arrested him, and eventually had him available for participation in the corporeal lineup at which Howland identified defendant as the man who robbed her in October 2018.  The evidence that defendant was arrested while driving a SUV that closely matched the description of the SUV videotaped leaving the scene of the third robbery also gave rise to an inference that defendant was the man who committed the third robbery.

The victim of the third robbery, Evans, also testified that the man who robbed her specifically asked about the bank bag when she opened the safe.  Evans responded to the robber that she could not open the safe that contained the bank bag.  From the evidence that defendant committed the third robbery and asked about the bank bag, which would not normally be found in the safe that the clerk could open, a reasonable jury could infer that defendant knew about the bank bags and believed that the clerk could open the safe with the bank bag.  When that evidence is considered along with Howland's testimony that the man who robbed her in October 2018 stole a bank bag from the safe that she was able to open, a reasonable jury could infer that the man who committed the third robbery—defendant—was also the man who committed the first robbery.  Stated another way, the details from the third robbery—considered together with the details from the first robbery—were relevant for a purpose other than to establish character and action in conformity with character; namely, it was proper to establish defendant's identity as the man who committed the first robbery.  See MRE 401; MRE 404(b)(1).  The same is true of the evidence from the second robbery and the evidence seized from defendant's SUV and apartment.

Howland testified that she was certain that the man who robbed her during the second robbery, which occurred in January 2019, was the same man who robbed her in the first robbery.  She knew this because she recognized both his voice and his facial features.  Therefore, the video evidence from the second robbery became relevant for evaluating whether defendant was in fact the man who committed the first robbery.  The jury could compare the video and still images of that robbery to the video and still images from the other two robberies to determine whether the person who committed the first robbery appeared to be the same person who committed the second and third robberies.  Because there was evidence—Howland's identification testimony, the details of defendant's arrest, and Evans's testimony about the bank bag—that established that defendant committed the second and third robberies, if the jury determined that the images of the person who committed the first robbery closely resembled the images of the person who committed the second and third robberies, that determination would permit an inference that defendant was responsible for all three robberies.  In fact, a review of Exhibit 131 shows that the still images from the videos each depict a perpetrator who has a similar jaw line, similar facial hair, similar shape of nose, and similar build.  Those images in turn were consistent with the photo of defendant from his driver's license and similar to defendant's booking photo.  In his closing, the prosecutor also suggested

-11-

that the positioning and body language of the person depicted committing each of the robberies was the same from video to video. Accordingly, the video and still images from all three robberies helped establish defendant's identity as the person who committed the robbery at issue, which was a proper purpose for the admission of the other-acts evidence. See MRE 404(b)(1).

Additionally, the totality of the evidence from the three robberies tended to correlate well with Howland's testimony; those correlations lent weight and credibility to her testimony. And other acts testimony and evidence may properly be admitted to bolster a witness's credibility. *Johnigan*, 265 Mich App at 466-467 (stating that other-acts evidence may be introduced to demonstrate that a witness was not mistaken or was not fabricating testimony).

There was also testimony and evidence that officers found clothing in defendant's apartment that was consistent with the clothing worn by the perpetrator of all three robberies. Although the individual items of clothing were common items that many people might own, when considered together with the other evidence, the evidence of the clothing established a strong inference that defendant was the perpetrator of all three robberies. The evidence showed that defendant was stopped and arrested while driving a SUV that matched the images of the SUV leaving the scene of the third robbery. It also showed that defendant's physical appearance matched the physical appearance of the person depicted in the videos from all three robberies, that defendant had clothing in his apartment that was consistent with the clothing worn by the perpetrator in all three robberies, that he had black gloves similar to the ones worn by the perpetrator in one robbery, that he possessed loose cash consistent with the cash that was stolen from the registers during the last robbery, and that he had a coin roll that was consistent with the types of coin rolls that had been stolen. Although possession of any one piece or few pieces of such evidence might be mere coincidence, the increasing number of correlations with the robberies made it less and less likely that mere coincidence explained that all the evidence was associated with defendant. Examined as a whole, a reasonable jury could conclude that it was not a mere coincidence that he drove the same make and model vehicle with the same aftermarket rims, that he had the same clothing used in each robbery, that he obtained the same coin rolls, and that he possessed the same cash denominations stolen from the register drawers. Rather, the confluence of all of this evidence strongly implicated defendant as the perpetrator of all three robberies. Accordingly, the prosecution could properly admit the evidence from the other two robberies to establish defendant's identity as the perpetrator of the first robbery. See MRE 404(b)(1) (noting that one proper purpose for the admission of other acts evidence is to establish identity).

On appeal, defendant argues that other-acts evidence may only be admitted to prove identity when the other acts meet the requirements stated in *People v Golochowicz*, 413 Mich 298; 319 NW2d 518 (1982). The test for admitting other acts to prove identity in *Golochowicz* involved a modus operandi theory for proving identity. See *VanderVliet*, 444 Mich at 66 (stating that the test in *Golochowicz* applied when the proponent uses a modus operandi theory to prove identity). Under that theory, the similarities between the uncharged conduct and the charged conduct must be so strikingly similar as to amount to the perpetrator's signature. *Golochowicz*, 413 Mich at 311-312. However, when the proponent does not seek to establish identity through modus operandi— that is, through the similarity of the other acts and the charged offense—the requirements stated in *Golochowicz* do not apply. *People v Mardlin*, 487 Mich 609, 621-622; 790 NW2d 607 (2010) (rejecting the contention that the rule stated in *Golochowicz* applied outside the context of a modus operandi theory for proving identity).

In this case, the prosecution did not try to establish that the similarities between the robberies were so great that proof that defendant committed one of the other robberies showed that he likely committed the robbery at issue. Rather, the prosecution presented the other-acts evidence to establish particular facts—such as the knowledge of the perpetrator of the third robbery and the clothing worn by the robber during each robbery, which matched the clothing found in defendant's apartment—that made it more likely that defendant had to have been the one who committed the robbery in October 2018. The prosecutor also used the evidence of the other robberies to enhance the weight and credibility of Howland's identification. Because the prosecutor did not rely on a modus operandi theory to establish defendant's identity as the perpetrator of the first robbery, the rule stated in *Golochowicz* did not apply. See *id*.

Even though the prosecutor did not try to prove identity through modus operandi, there were sufficient similarities in the robberies to permit the introduction of the other-acts evidence for an additional proper purpose: to prove common scheme, plan, or system. To be admissible to prove a common scheme, plan, or system, the other acts need only be "sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Sabin*, 463 Mich at 63. There must be such a concurrence of common features that the acts are naturally to be explained as being caused by a general plan. *Id*. at 64-65.

The prosecution established that the similarities were sufficient to permit a jury to infer that the perpetrator of all three robberies operated according to a common scheme or plan. *Id*. at 63-65. The evidence showed that the robber targeted Dollar General stores in the Muskegon area. He went to the stores on Sundays at about the time the stores first opened. He wore clothing on his head that might conceal his face and brought a weapon. In each case, the robber threatened a clerk with the weapon and demanded the money. The robber also went behind the counter and compelled the clerk to open the safe. The evidence suggested as well that the robber was specifically looking for the bank bag in the second and third robberies, which was consistent with the same person having committed the first robbery. After stealing the cash from the register drawers and safe, the robber fled the store. The most natural explanation for these similarities was that the robber had a common plan that he employed when robbing the stores. See *id*.

On appeal, defendant focuses on the dissimilarities and argues that the similarities are acts common to most robberies. But the identified similarities are not common to most robberies. There is no indication that most robbers target the same chain of stores or select Sunday mornings just after the stores open for the timing of their robberies. Also, although many robberies include the use of a weapon, it is not so common that the robber would approach a store clerk, reveal the weapon and bring it into close proximity to the clerk, and use it to compel the clerk to open a safe. As such, one cannot so readily dismiss those similarities.

The differences that defendant identified also do not undermine the common features of the apparent plan. Defendant notes, for example, that the robber used a gun in one robbery and a knife in the other two. A gun is certainly different than a knife, but they are both deadly weapons, and they both may be used to fulfill the role for which they were intended: to induce fear of injury to compel the clerk to comply with the robber's demand to open the safe. The difference was not such that a reasonable jury could not infer a common plan.

Defendant also suggests another difference: that a getaway car was used in the third robbery and was not used in the other two. There is no evidence that the robber did not use a getaway car in the first two robberies. Defendant in essence relies on the absence of evidence of a getaway car to establish that there was in fact no getaway car. The record does not support the existence of that difference.

Examining the evidence as a whole, there were sufficient similarities to warrant the admission of the other acts to prove a common plan, scheme, or system. See *id*. As such, the trial court did not err to the extent that it determined that the other-acts evidence was admissible for that purpose in addition to proving identity and bolstering Howland's credibility. See MRE 404(b)(1).

Defendant finally argues that the other-acts evidence should have been excluded under MRE 403, even if admissible for a purpose other than to prove character and action in conformity with character. Even when other-acts evidence is relevant and admissible for a proper purpose, a trial court should exclude it if its probative value is substantially outweighed by the danger of unfair prejudice. See MRE 403. To be unfairly prejudicial, the evidence must be more than merely damaging to the defendant's case. *People v Cowhy*, 330 Mich App 452, 467-468; 948 NW2d 632 (2019). To warrant exclusion, the evidence must be such that there is a tendency that the jury will give the evidence undue or preemptive weight or when it would otherwise be inequitable to allow the use of such evidence. *Id*. at 468 (citation omitted). Evidence is unfairly prejudicial when it is marginally probative and there is a danger that the jury will give it weight that is substantially out of proportion to its logically damaging effect. *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995).

The evidence of the other robberies was highly relevant. It lent considerable weight and credibility to Howland's identification of defendant, it independently established defendant's identity as the perpetrator, and it established that he had a common plan, scheme, or system for acting. Indeed, the other-acts evidence strengthened the prosecution's case to the point at which it was nearly overwhelming. Without the other acts evidence, by contrast, the jury would have had to assess whether Howland had accurately identified defendant as the perpetrator without knowing that she observed him and heard him during two incidents. They might not have heard that he was apprehended while driving a SUV that matched the description of the SUV used to flee the scene of yet another robbery at a Dollar General. They would not have heard that he had clothing in his apartment that was consistent with the clothing worn by the robber on three separate occasions. They would not have had the additional video footage and still images with which to compare defendant's appearance. Stated another way, without the other-acts evidence, the jury would have been left with a classic he-said-she-said case with Howland's testimony looking suspect because of the gaps left in the evidentiary record. See *VanderVliet*, 444 Mich at 75 (stating that courts must examine the availability of other means of proof when reviewing a determination under MRE 403).

This was not, therefore, a situation in which there was a danger that the jury might give marginally probative evidence weight substantially out of proportion to its logically damaging effect. Rather, the evidence was highly relevant and had substantial probative value. Given the probative value, there was no danger that the jury would weigh the evidence out of proportion to its probative value. See *Mills*, 450 Mich at 75-76. Finally, the trial court instructed the jury on

the proper use of the other-acts evidence, and that instruction safeguarded defendant's rights. See *Roper*, 286 Mich App at 106.

The trial court did not abuse its discretion when it allowed the other-acts evidence at issue. See *Clark*, 330 Mich App at 415.

## V. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Defendant also argues that the prosecutor deprived him of a fair trial by vouching for his case, denigrating the defense, and vouching for witnesses. This Court reviews de novo whether a prosecutor's misconduct deprived the defendant of a fair and impartial trial. *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). However, because these claims are all unpreserved, this Court reviews them for plain error that affected defendant's substantial rights. See *Carines*, 460 Mich at 763.

### B. ANALYSIS

On appeal, defendant argues that the prosecutor repeatedly suggested that defense counsel did not believe her own client by referring to the defense's case as smokescreens and distractions. Defendant argues that these improper remarks prejudiced his defense and warrant a new trial.

The test for prosecutorial misconduct is whether the prosecutor's remarks deprived the defendant of a fair and impartial trial. *Abraham*, 256 Mich App at 272. A prosecutor may not inject issues broader than the defendant's guilt or innocence in his or her opening and closing remarks. *People v Bahoda*, 448 Mich 261, 284; 531 NW2d 659 (1995). The prosecutor cannot, for example, make an argument that questions the defense counsel's veracity because such an argument implies that even defense counsel does not believe his or her own client, which undermines the presumption of innocence. *People v Wise*, 134 Mich App 82, 101-102; 351 NW2d 255 (1984).

Defendant maintains that the prosecution impermissibly attacked defense counsel and undermined the presumption of innocence by referring to the defense's case as distractions and smokescreens. He cites comments that the prosecutor made in his opening and closing statements.

In his opening statement, the prosecution argued that the evidence identifying defendant as the robber was strong. He stated that Howland would identify defendant as the perpetrator and that none of the evidence would "show that it was not him" and that "all of it" would "corroborate the fact that it was." Nevertheless, the prosecutor admitted that Howland had earlier identified a possible suspect whom she was only 50% certain about, who was not defendant, and he acknowledged that there were other gaps in the physical evidence. He then asked the jurors not to be distracted by those gaps in the evidence:

> This case is about the evidence. Don't pay attention to the smoke screens or the distractions that will come your way, like Ms. Howland's guesstimate that it could have been this other person in her original I.D.

Don't pay attention to the fact that in the first robbery, the one you're asked to decide, the Defendant did not leave behind any usable fingerprints or any DNA, and we talked about that.

Ms. Bremer in her voir dire said: Pay attention to what the police—they didn't follow through. They did. You're going to hear from the police officer who was on scene and what he did, based on his training and experience, to preserve the evidence, preserve this bottle, this NyQuil bottle, and this tea bottle, and other items in the drawer, things like that.

They tried their hardest. They preserved it just like they are supposed to. They brought it to the police department or Evidence Technician who is trained and does this stuff all the time. They dusted for fingerprints. They tried.

And when that was not successful, they sent it to the lab, Michigan State Police Crime Lab, and said: Try to get DNA or fingerprints, and they tried, and they were unsuccessful. It was not for lack of trying. They didn't screw anything up.

Remember in voir dire I said: Pay attention to what the experts tell you. They will tell you that it is unlikely to find fingerprints or find DNA. It doesn't never happen, but that it's unlikely, and listen to them about why it's unlikely.

I expect Ms. Bremer will say: There are no fingerprints. She's right. We wouldn't expect there to be, but it doesn't mean they didn't try.

Same thing with DNA. That's one of those smoke screens and distractions. We don't need that evidence because Latora Howland says it was him, with certainty. It's not like we have prints or DNA that it was somebody else either.

The context of the prosecutor's remarks show that the prosecutor focused his comments on the evidence. He asked the jury to look at the strength of the evidence that the prosecution had to support defendant's identification as the perpetrator rather than the gaps in the evidence, which gaps he characterized as distractions and smokescreens. Although the prosecutor implied that the defense would focus on the gaps, he did not explicitly attack defense counsel or suggest that defense counsel did not believe her own client. Consequently, these remarks did not undermine the presumption of innocence. See *Wise*, 134 Mich App at 101-102.

Defendant also argues that it was improper for the prosecutor to "vouch" for his case. Specifically, defendant faults the prosecutor for stating that his case was strong:

Oftentimes in cases I work very, very hard to paint a picture for a jury, to use analogies, tell stories, things like that. I'm not going to do that here because the evidence is overwhelming in this case.

After this remark, the prosecutor explained the nature of evidence and then summarized the evidence that he believed would be presented. He argued that that evidence would establish beyond a reasonable doubt that defendant committed the first robbery.

The opening statement is the point at which a party can point out what he or she expects the evidence will show. *People v Johnson*, 315 Mich App 163, 200-201; 889 NW2d 513 (2016). The prosecutor may not normally, however, interject his or her opinion about the strength of his or her case against the defendant. *Bahoda*, 448 Mich at 285-286. The prosecutor may not place the prestige of his or her office behind his or her opinions in an effort to get the jury to suspend its power of judgment for that of the prosecutor. *Id*. at 286-287.

In this case, the prosecutor primarily focused on the evidence that would be presented and argued that it would show that defendant was guilty beyond a reasonable doubt. The prosecutor characterized this evidence as overwhelming but did not suggest that he had special knowledge of defendant's guilt or argue that the jury should suspend its power of judgment in favor of his. Accordingly, although the comment that the evidence was overwhelming might have been ill-advised, when read in context, it did not amount to misconduct. See *id*. at 286-287.

The prosecutor's remarks—to the extent that they could be characterized as attacking defense counsel's veracity or putting the weight of his office behind his assertions—did so impliedly rather than blatantly, and so were not particularly prejudicial. See *People v Watson*, 245 Mich App 572, 591-592; 629 NW2d 411 (2001). Had defense counsel objected to these comments, the trial court could have crafted a timely and appropriate instruction that would have reminded the jurors that their duty was to decide the case on the basis of the evidence alone and not on the basis of the prosecutor's comments. The jury would presumably have followed such an instruction, and the instruction would have cured any minimal prejudice. See *Abraham*, 256 Mich App at 279 ("Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors."). For that reason, these remarks do not warrant relief.

Finally, defendant argues that the prosecutor improperly vouched for Howland's credibility when he characterized her testimony as "open and honest" and vouched for Evans when he stated that she was "credible and not embellishing." Defendant isolates these remarks and ignores the context. In both cases, the prosecutor argued at length that the evidence corroborated both witnesses and that their answers fit with their experiences. He maintained, on that basis, that they were credible. At no point did the prosecutor place the weight of his office behind these assertions or suggest that he had some special knowledge that they were testifying truthfully. See *Bahoda*, 448 Mich at 276 (stating that it is improper for a prosecutor to vouch for the credibility of a witness by implying that he or she has some special knowledge of the witness's veracity). Instead, the prosecutor made proper arguments that, on the totality of the evidence, the witnesses were worthy of belief. See *Clark*, 330 Mich App at 434 (stating that a prosecutor may argue from the facts that the witness is worthy of belief).

Defendant has not identified any prosecutorial misconduct that rose to the level of plain outcome-determinative error. See *Carines*, 460 Mich at 763.

## VI. SENTENCING ERROR

Finally, defendant claims that the trial court erred when it assigned five points under Offense Variable (OV) 12. See MCL 777.42. Even assuming that to be the case, that error would not warrant relief. Armed robbery is a Class A offense. See MCL 777.16y. The trial court scored defendant's OVs at 65 points and his prior record variables at 137 points, which placed him in

Grid F(IV) under the minimum sentence range for Class A offenses. Subtracting five points from defendant's OV total would still leave him in that grid. See MCL 777.62. Consequently, defendant is not entitled to resentencing. See *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

Affirmed.

/s/ Thomas C. Cameron
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola